ALTMAN v. SPROLES.

Opinion delivered November 19, 1923.

1. TRIAL—DISCHARGE OF SURETY—INSTRUCTION.—A charge that a surety on a building contract was not discharged unless there was a material change in the construction or in the contract, that is, in the grade of lumber used, was erroneous as eliminating from consideration any question as to other material changes that might have been made.

2. APPEAL AND ERROR—INSTRUCTION—HARMLESS ERROR.—Where an instruction contains error in appellant's favor, a judgment will not be reversed on that ground alone.

3. APPEAL AND ERROR—INSTRUCTION—PREJUDICIAL ERROR.—An instruction which assumed that a change in the grade of lumber furnished under a building contract was a material variation therefrom, thereby discharging a surety on the bond of the

contractor, was prejudicial error where there was a question as to
its materiality.

4. PRINCIPAL AND SURETY—MATERIALITY OF ALTERATION—JURY QUES-
TION.—Where the evidence was conflicting as to whether the cost
of a building was increased by a change in the material furnished
by the contractor, whether the change was so material as to
discharge a surety on the contractor's bond, held for the jury.

5. PRINCIPAL AND SURETY—DISCHARGE OF SURETY—CHANGES IN PLAN.—
A stipulation in the bond of a building contractor that any
alteration in the plans between him and the owner would not
release the surety applied only to those changes which did not
increase the cost of the building beyond the amount that the
owner, by contract, had agreed to pay, there being no provision
for his paying any more.

6. PRINCIPAL AND SURETY—CHANGE OF PLANS—LIABILITY OF SURETY.
—Under a stipulation in a bond of a building contractor that
any alterations in the contract would not discharge the surety
if there was no substantial change in the plans, the surety would
be liable even if the building cost exceeded the contract price.

Appeal from Phillips Circuit Court; *J. M. Jackson,*
Judge; reversed.

*Bevens & Mundt,* for appellant.

1. Under the stipulation and agreement in the bond
with reference to changes and alterations, no changes
or alterations shown in this case, whether material or
immaterial, could release the surety. It permits any and
all alterations and changes, not alone in the terms of the
contract, but also in the nature of the work to be done,
and is not limited in any manner as to the character or
nature of these changes. 21 R. C. L. 1012, § 60; 86 Ark.
212; 82 Ark. 247; 16 Ann. Cases, 348-349; 6 Cyc. 83;
32 N. Y. Super. Ct. (2 Sweeney) 25; 98 S. W. 387; 152
Pac. 668; 256 Mo. 133; 165 S. W. 314; 34 Neb. 670; 73
Pac. 772. Therefore, appellant was entitled to a per-
emptory instruction.

2. In any view of the case the court's oral instruc-
tion was reversible error, in that it was a question for
the jury whether or not the change in the grade of the
lumber was a material change. 112 Ark. 207; 93 Ark.
472.

*W. G. Dinning,* for appellees.

Both the bond and contract having been prepared by the appellant, any ambiguities or uncertainties therein will be construed as unfavorably as their terms will admit against the appellant. 73 Ark. 338. The position insisted upon by appellant, viz: that the stipulation in the bond gave the contractor and owner *carte blanche* to make any and all changes in their contract that they might deem proper, is contrary to the decisions of this court. 66 Ark. 287, 290.

SMITH, J. Appellant Altman employed appellee Sproles to build three dwelling-houses in the city of Helena. Altman prepared a memoranda of the agreement, but it is quite obvious that the writing which the parties signed did not embody the entire contract. The provision relating to the consideration to be paid reads as follows: "That the contractor agrees to building for J. L. Altman on his lot on the corner of Beech and York streets, in the city of Helena, State of Arkansas, three houses, as agreed, for the sum of $6,000, to be paid as follows: Pay-roll every week, and for materials as presented when O. K. by H. Sproles." The houses were to each have four rooms and a bath, but nothing was said about closets, nor was anything said in the writing about the material, except that "the contractor agrees to build the houses in a first-class, workmanlike manner, and agrees to leave the lots in a clean condition."

To indemnify the owner, the contractor executed a bond, with appellee Hightower as surety, to fully indemnify and hold the owner harmless against any and all loss, including laborers' and mechanics' liens and liens for materials furnished.

This bond contained the following stipulation: "Any alterations made by agreement by and between the said Henry Sproles (the contractor) and the said Julius Altman (the owner), in the terms of the contract, or the nature of the work to be done, or the giving to the said Henry Sproles, or his executors, administrators, or

heirs, any extension of time for performing said contract, or any of the stipulations therein contained and on the part of the said Henry Sproles to be performed, or any forbearance on the part of the said Julius Altman to the said Henry Sproles, his heirs, executors, or administrators, shall not in any way release the said Henry Sproles or the surety in this bond.''

After the completion and acceptance of the buildings and the payment to Sproles of the contract price, a materialman filed a claim for a lien and recovered judgment for materials furnished amounting to $1,235.34, and Altman was required to pay the judgment, whereupon he sued on the bond which Hightower had executed as surety.

Altman testified that he and Sproles agreed on the plans of the buildings, and that he did not authorize any changes, and none were made; that there were some additions, but these he paid for, and that he authorized no changes in the materials, and none were made, and he denied that certain plans which Sproles offered in evidence had been agreed upon as the plans for the buildings.

Sproles testified that he prepared rough plans for the buildings, and Altman approved and accepted them. These plans did not provide for any closets, yet Altman directed that three be built in each house, and the cost of each closet was around $75. The plans called for a foundation of plain brick, but Altman required that the foundations be stucco. No. 2 lumber was to be used in the houses, but Altman directed that No. 1 be used, and there was a difference of between thirty and thirty-five dollars per thousand feet in the price. The contractor testified that the changes in the plans and materials which Altman ordered added $1,300 to the cost of the buildings. He also testified that the extras for which Altman paid him were fences, sidewalks and coal-houses, which were not in the original contract at all.

The dealer who furnished the materials for the buildings testified that the price of the first estimate of the materials to be used in the buildings was $2,700, but that the materials actually used amounted to $3,500, and that the difference arose not only from the change in the grade of materials but also from the quantity used.

The court gave, at the request of Altman, instructions which, in effect, told the jury to find for him if they accepted his statement of the transaction as true; but the court declined to give an instruction numbered 2, reading as follows: "You are instructed that any change or alterations in the original contract between Henry Sproles and J. L. Altman will not in any manner release the defendant, Carey Hightower, from liability on the bond sued on in this action. You are further instructed, in this connection, that any extension of time for performing the said contract, or any stipulations contained in the contract, will not in any way release the defendant, Carey Hightower, from his liability on said bond, for the reason that it is agreed in the face of the bond itself that any alterations made by agreement between Henry Sproles and Julius Altman under the terms of the contract shall not release the said Henry Sproles."

At the defendants' request the jury was told to find for the defendant surety if material changes were made without his consent.

Instructions numbered 2 and 3 were given at the request of the defendants, over plaintiff's objections. These instructions read as follows:

"2. If you find from the testimony in this case that the class of lumber that was used in the erection of the houses by the defendant was changed from grade No. 2 to grade No. 1, and that such change was made after the bond upon which this suit is brought was signed and delivered, and if you find that such change in the grade of lumber was made without the consent of Carey Hightower, and that such change was material, then you will find for the defendant, Carey Hightower."

"3. The jury is instructed that, in determining whether the changes in the building contract, if any, were material, you are instructed that any change of a substantial nature in the plans of the buildings or the materials to be used, which said changes cause a substantial change in the cost of same, are material changes; and if you find that such changes were made in the building contract in this case without the consent of Carey Hightower, then you will find for the said defendant, Carey Hightower."

After giving these instructions, the court charged the jury orally as follows: "Before you can find for the defendant in this case, you must find from the evidence that there was a material change in the construction or in the contract for the erection of these three buildings; that is, that the grade of material was changed from grade No. 2 to grade No. 1 with the consent of the plaintiff."

There was a verdict in favor of the defendants, and judgment accordingly, and Altman appealed.

We think the giving of the oral instruction was an error which requires the reversal of the judgment. In the first place, it eliminates from the jury's consideration any question about the foundation, or the closets, and limits the jury's consideration to the change of material from grade No. 2 to grade No. 1. In this respect it is more favorable to Altman than it should have been, as the jury might have found that there were changes in the foundation and in building the closets, and that these changes were material. Had there been no other error in the instruction, the judgment would not be reversed, as the error just indicated is in Altman's favor. But the prejudicial error is in assuming that a change from No. 2 to No. 1 was material. The jury might well have found that this change was material, but we have concluded this was a question of fact upon which the jury should have passed judgment, under the instructions given by the court defining material changes.

We have reached this conclusion because the evidence is uncertain as to the extent of the increased cost due to change of grade in materials. Much of the increase of cost might be accounted for by a change in plans, or by the use of more material than the first estimate called for.

Appellant Altman insists the judgment should be reversed because the court refused to charge the jury, as requested by him, that any change agreed upon between himself and Sproles, the contractor, would not release the surety. This contention is based upon the stipulation in the bond, set out above, that any alteration made by agreement between Sproles and Altman should not in any way release the surety.

In support of this contention appellant Altman cites numerous authorities to the effect that sureties on a builder's bond are not released by substantial changes in the plans where the bond itself authorized those changes to be made. Among the numerous other authorities cited is the case of *Woodruff* v. *Schultz*, 155 Mich. 11. This case is very extensively annotated in vol. 16 A. & E. Cases, p. 346, and a number of decisions of this court are cited in the annotator's note.

It appears that there are many cases which have held that the surety may consent in advance that material changes may be made, and when he has consented he is not released from liability after they are made. But in all the cases which we have examined (and we are sure it must be true in all others) there was provision that the contractor or builder should be paid the increased cost, if any there was. In principle the recent case of *Kerby* v. *Road Imp. Dist.*, 159 Ark. 21, was of that character. There it was provided that important changes or alterations might be made upon the written order of the engineer, but the contract also provided that "the price covering such changes or alterations shall be fixed by agreement between the engineer and the contractor." In the instant case the contract obligates the owner to pay

only $6,000, and there is no provision by which it might be ascertained that he should in any event pay more. The recital in regard to the price or consideration which we copied above is the only provision in regard to payment. The owner does not contend that these changes might be made after he and the contractor had agreed upon the price, but, on the contrary, he plants himself on the proposition that the contract limits his liability to $6,000 in any event; and in this he appears to be correct, and upon this theory he has sued the surety for the excess over the contract price of $6,000. His whole case is predicated upon the assumption that $6,000 is the maximum sum he was required to pay for the buildings, and by his instruction numbered 2, set out above, he asks the court to charge the jury that he and the contractor might make changes *ad libitum* without releasing the surety, and the instruction makes no reference whatever to any additional compensation therefor. As the contract thus limits the owner's liability, we conclude that the changes contemplated are those which do not involve a substantial increase in the cost of the buildings.

The doctrine of the case of *Miller-Jones Furniture Co.* v. *Fort Smith Ice & Cold Storage Co.*, 66 Ark. 287, is applicable here. In that case the contract provided that: "It is further agreed that the said party of the second part may make any alterations, deviations, additions or omissions from the aforesaid plans, specifications and drawings, or either of them, which they shall deem proper, and the said architect shall advise, without affecting or making void this contract, and in all such cases the architect shall value or appraise such alterations, and add to or deduct from the amount heretofore agreed to be paid to said party of the first part the excess or deficiency occasioned by such alterations."

Extensive changes in the plans of the building were made, which, the court held, discharged the surety, notwithstanding the authorization, contained in the con-

tract, to the owner to make any alterations, deviations, additions or omissions from the plans and specifications which he deemed proper and the architect advised, without affecting the contract or making it void.   Because of this provision the owner sought to hold the surety, but the court, through Justice RIDDICK, said: "But we are of the opinion that the parties did not intend by this provision to authorize changes so extensive as the one complained of here.  The provision referred to, which is set out in the statement of facts, permits such alterations to be made, even without the consent of the contractor, and provides that the architect shall determine the amount to be paid or deducted therefor.   We cannot suppose that the parties intended by this provision to permit the owner to make great and extensive changes in the plan of the building, and to force the contractor to complete it in conformity therewith, at such compensation as might be allowed by the architect.   The fact that these alterations in the plan could be made without the consent of the contractor forces us to the conclusion that the alterations referred to were such minor changes as owners often wish to make in the plans of buildings while they are under construction, and which do not greatly affect the undertakings of the contractor.   *Dorsey* v. *McGehee* (Neb.). 46 N. W. 1018; *Consaul* v. *Sheldon* (Neb.), 52 N. W. 1104."

It thus appears that the court restricted the right to make changes to those which were not great and extensive, these terms being used, of course, in comparison with the subject-matter of the contract, because, as it was there said, it was not to be presumed that the contractor meant to give the owner and the architect the power to compel him to do any work the owner might desire done at such price as the architect might fix.

So here, it is not to be assumed that the parties were agreeing that the owner might have three buildings erected, upon such plans as he might finally adopt, without regard to the cost to the contractor and with a cost

limit to himself of $6,000. From the testimony in this case the jury might have found that the contractor followed the owner's direction in making the changes, under the belief that he would be paid therefor, but without any promise to that effect by the owner. Surely it was not the purpose of the surety to guarantee the performance of such a contract, yet the owner, even now, contends that $6,000 was the full contract price to be paid by him, except, of course, for additions which were not covered by the contract at all. We think a more reasonable interpretation of the contract is that the surety consented in advance to any changes, however material, which were not so great and extensive as to cause a substantial increase in the cost of the buildings.

Of course, if there was no substantial change in the plans, the surety was liable for the increased cost, however much that excess might be over the contract price. But, on the other hand, we think the contract conferred no authorization to make substantial changes in the plans which materially increased the cost of constructing the buildings.

For the error in giving the oral instruction the judgment is reversed, and the cause remanded.

### CONCURRING OPINION.

McCulloch, C. J. I agree with the majority in the reversal of the judgment on account of the error indicated in the opinion, but I do not agree to the limitations placed by the majority upon the liability of the surety in holding that, in order to bind the surety to the change, there must be an allowance of additional compensation to the principal contractor for any additional cost. The surety consented in advance for "any alterations" made by agreement between the principal contractor and the owner "in the terms of the contract or the nature of the work to be done," and the authorities cited in the brief of counsel for appellant sustain the view that this stipulation is binding on the surety.

The language of the contract means that the surety agrees in advance to abide by any alteration that the principal contractor may agree to with the owner. The contract does not restrict the alterations to immaterial ones. Of course, the changes must be such as fall within the term "alterations," and not be of so general a nature as to change the whole plan and scope of the work to be done under the contract. Nor would the surety be bound by an alteration so grossly disproportionate to the work originally contracted for and without compensation as to amount to a fraud on the surety. In the present case, however, there is no hint of fraud or connivance between the principal contractor and the owner to defraud the surety. Nor is it shown that the alterations were so extensive as to change the whole plan and scope of the work.

So far as additional compensation is concerned, the surety, by his contract, has undertaken to leave that to the principal contractor, and agrees in advance to abide by any alteration consented to by the contractor, regardless of compensation. I see no reason why a surety cannot make such a contract, and it seems to me that it has been done in this case, according to the plain language used.

In the case of *Miller-Jones Furniture Co.* v. *Fort Smith Ice & Cold Storage Co.*, 66 Ark. 287, the court dealt with a contract which permitted changes, or alterations, to be made without the consent of the principal contractor, and the court was constrained to hold, in interpreting the contract, that, inasmuch as additional work might be forced on the contractor without extra compensation, the language should be interpreted to refer only to immaterial changes. The contract in the present case is entirely different, for it does not force any additional work or alterations on the contractor against his own consent. The contract expressly provides that the surety shall consent only to any alterations which may be agreed upon between the principal contractor and the owner.